# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM SMITH,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:12-cv-3469-JHH** |
| **CITY OF BIRMINGHAM;** | ) | |
| **CHIEF OF POLICE A.C. ROPER,** | | |
| individually and in his official | ) | |
| capacity; **OFFICER BRYAN SMITH,** | | |
| individually and in his official | ) | |
| capacity; **OFFICER ROBERT SIMS,** | | |
| individually and in his official | ) | |
| capacity, | | |
| | ) | |
| **DEFENDANTS.** | | |

## MEMORANDUM OPINION

The court has before it the November 1, 2013 Motion (Doc. # 9) for Summary

Judgment filed by Defendants the City of Birmingham, Chief of Police A.C. Roper,

Officer Bryan Smith and Officer Robert Sims.  Pursuant to the court's November 11,

2013 order (Doc. # 10), the Motion (Doc. # 9) was deemed submitted, without oral

argument, on December 16, 2013.  After consideration of the briefs and evidence

before the court, the Motion (Doc. # 9) is due to be granted in part and denied in part

as to Officers Smith and Sims and the Motion (Doc. #9) is due to be granted in full

as to the City of Birmingham and Chief Roper for the reasons stated herein.

## I. Background

Plaintiff William Smith commenced this action on August 23, 2012 by filing the instant Complaint (Exh. 1 to Doc. #1) in the Circuit Court of Jefferson County, Alabama, against Defendants the City of Birmingham, Chief of Police A.C. Roper, Officer Bryan Smith and Officer Robert Sims[1] alleging the following: excessive force against Officers Smith and Sims (Count One); assault and battery against Officers Smith and Sims (Count Two); failure to intervene against Officers Smith and Sims (Count Three); negligent supervision against the City of Birmingham and Chief Roper (Count Four); inadequate training against the City of Birmingham and Chief Roper (Count Five); deliberate indifference against the City of Birmingham and Chief Roper (Count Six); and the tort of outrage against Officers Smith and Sims (Count Seven). (Id.) According to the Complaint, the claims are brought to "vindicate Plaintiff's rights under the United States Constitution, the Alabama State Constitution, and under the statutory laws of the United States and Alabama." (Compl. ¶ 1.) The Complaint seeks "compensation and punitive damages against each of the individual Defendants and the City Defendant's [sic] in their individual

---

[1] The Complaint also contains allegations against "fictitious defendants." Plaintiff never amended the Complaint to substitute defendants who are real parties in interest. As such, the assertion of these "fictitious defendants" are mere surplusage and are disregarded by the court.

capacities." (Id.)

On September 27, 2012, Defendants removed the action to this court pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1443, since Plaintiff alleged claims arising under the laws of the United States. (See Doc. #1.)  On October 16, 2012, each Defendant filed a separate Answer (Docs. # 2, 3, 4 & 5) to the Complaint generally denying liability to all the charges.

On November 1, 2013, Defendants the City of Birmingham, Chief of Police A.C. Roper, Officer Bryan Smith and Officer Robert Sims filed the instant Motion (Doc. # 12) for Summary Judgment.  The Motion contends that there  is no genuine issue of material fact and that all of Plaintiff's claims fail as a matter of law.  (Id.) Simultaneously filed with the Motions for Summary Judgment, Defendants also filed a separate brief and evidence[2] (Exhs. 1-4 to Doc. # 12) in support of the Motion for Summary Judgment.   On December 6, 2013, Plaintiff filed a brief and evidence[3] (Doc. # 11) in Opposition to the Motion for Summary Judgment.  On December 16, 2013, Defendants filed a brief (Doc. # 12) in reply to Plaintiff's Opposition.  All briefs and evidence have been considered by the court in deciding the instant Motion.

---

[2] Defendants submitted the following evidence in support of summary judgment: affidavit of Bryan Smith with attachments; affidavit of Robert Sims with attachments; affidavit of William King; and deposition of William Smith.

[3] Plaintiff filed the following evidence in opposition to summary judgment: affidavit of William Smith; and certified copy of record from Birmingham Municipal Court.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. See id. at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. See Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

5

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. <u>See</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts

The Plaintiff's and Defendants' version of events surrounding the incident at issue are so different that the court divides the narrative of facts into two separate

versions, keeping in mind that where they are different, the court accepts Smith's version[4] as true for purposes of summary judgment.

## A. Smith's Version of Events

On the evening of August 22, 2010, Smith ran into an old friend and went over to his house for a visit. (Smith Dep. at 37-41.) He was at his friend's home for most of the night. (Id. at 38-45.) Smith repeatedly testified that he was not drinking or doing any sort of drugs that night. (Id. at 45, 124, 141.) Sometime after midnight on August 23, 2010, Smith left his friends house on foot. (Id. at 45.) He walked a few blocks towards First Avenue North in Birmingham, Alabama, to try to find a store that was open. (Id. at 47.) When he got to First Avenue North, he turned onto the street and saw three police cars in front of a hotel at approximately First Avenue North and 50th Street. (Id. at 47-48.)

Smith was on the opposite side of the street from the hotel and police cars. (Id. at 49.) Smith testified that he "was messing up because" he "was on the street walking," as opposed to being on the sidewalk. (Id.) He was also looking to see what was going on at the hotel. (Id.) Smith stated that "the police said, the sidewalk made to walk on sir." (Id. at 49, 126.) Smith replied "yes, sir" and moved over to the

---

[4] The court has attempted to avoid any confusion by the fact that the Plaintiff and one of the Defendant officers have the same last name. The court always refers to Officer Smith as such. Any time the court uses simply Smith, the court is referring to the Plaintiff.

sidewalk and continued walking down First Avenue North.  (Id. at 50.)

Smith testified that he walked about a block further down First Avenue North when all of a sudden one of one of the officers came up to him and "put his hand on" Smith.  (Id. at 50, 52, 54.)  The officer then told Smith to "stop resisting arrest" and threw him down on the ground and "sprayed him."  (Id. at 54, 56.)  Smith testified that two officers, Officers Smith and Officer Sims, assaulted him and were involved in his arrest.  (Id. at 143.)  He admitted that "it took two of them" to restrain him because he "was being a man."  (Id. at 143-44.)  He testified that he was trying to get away from the officers and that he was wiggling on the ground while the two officers were trying to restrain him.[5]  (Id. at 183-84, 186-89.)  He stated that he was moving everything on his body and trying to get the officers to stop grabbing him and spraying him.  (Id. at 188-89.)  Additionally, Smith recalls that there were other officers around as well, but he testified that he could not see them because the two officers had thrown him on the ground and were "working with me, handling me and things."  (Id. at 56-57.)  Smith believes that the reason the officers approached him and attacked him was because they did not want him to see what was going on at the hotel.  (Id. at 196.)

---

[5] Smith denies that he attempted to put his hands in his pockets or that there was anything inside his pockets other than this keys and a wallet.  (Smith Dep. at 165-66.)  He testified that he did not have any type of weapon.  (Id. at 166.)

**B.  Officers Smith and Sims's Version of Events**

On August 23, 2010, at approximately 5:00 a.m., Officer Sims was on a traffic stop in the 5400 Block of First Avenue North in Birmingham, Alabama.  (Sims Aff. at 3.)  Officer Sims saw Smith and noticed that he was walking in the street of First Avenue North.  (Id.)  Officer Sims shouted to Smith and told him that he needed to walk on the sidewalk.  (Id.)   At this point, Officer Smith arrived in his patrol car and parked behind Officer Sims's patrol car.  (Id.; B. Smith Aff. ¶ 3.)

At approximately the same time, William King was driving to work in his pick-up truck.  (King Aff. ¶ 1.)  King drove down First Avenue North and came to a stop at the traffic light at the intersection of 55th Street.  (Id.)  King could see a patrol car that had pulled someone over coming in the opposite direction on First Avenue North, about a block away from where King was stopped.  (Id. at 1-2.)  As King was stopped at the red light, he felt a jolt in the back of his truck, which felt to King like the truck had been bumped relatively hard.  (Id. at 2.)  King looked in his rearview mirror and saw the shadow of an individual on his bumper who was trying to climb over the tailgate of the truck bed.  (Id.)  King drove off when the light turned green and the individual stumbled and fell off the back of King's truck and ended up lying in the

9

street.  (Id.)  The individual was Smith, according to King.[6]  (Id.)

King drove to the police who were on the next block at the traffic stop.  (Id.; B. Smith Aff. at 4; Sims Aff. at 4.)  King told Officers Smith and Sims that an individual had just tried to jump into the back of his pick-up truck and that the individual fell from the back of his truck when he pulled off from the red light.  (Id.) King pointed out the individual he was talking about to the officers.  (B. Smith Aff. at 4; Sims Aff. at 4.)

While King was talking to Officer Smith, Officer Sims walked toward the man King pointed out for the officers.  (Id.)  Officer Sims asked the individual to come to him.  (Sims Aff. at 4.)  Smith looked at Officer Sims and kept walking away.  (Id.) Officer Sims instructed Smith to stop.  (Id.)  Smith continued to ignore Officer Sims, and he did not stop.  (Id.)  Officer Sims reached for Smith's arm, and Smith jerked his arm away and attempted to flee.  (Id. at 4; Smith Aff. at 4.)

Officer Smith came over to assist Officer Sims.[7]  (Id.)  Both officers, as well

---

[6] Smith flatly denied the incident with the pick-up truck. (Smith Dep. at 141, 149.)  He testified that he had not done anything to break the law when the first officer approached him and put his hand on him. (Id. at 193.)  Instead, Smith believed that the officer were doing something at the hotel that they did not want him to see. (Id. at 196.)

[7] King also came over and parked his truck directly across the street from where Smith and the officers were. (King Aff. at 3.)

10

as King, perceived that Smith was intoxicated or under the influence of drugs.[8]  (B. Smith Aff. at 5; Sims Aff. at 5; King Aff. at 2-3.)   Smith put his hands in his waistband and Officer Sims attempted to pull Smith's hands free.  (Sims Aff. at 4; B. Smith Aff. at 4.)   Both officers then forced Smith down  to the sidewalk as he continued to resist arrest.  (Id.; King Aff. at 3.)  The officers continued to try to pry his hands from his waistband as they were on top of him on the sidewalk.  (Sims Aff. at 4; B. Smith Aff. at 4.)  Smith continued to resist to the extent that he was raising Officer Smith and Officer Sims off the ground.  (Id.; King Aff. at 3.)

Officer Smith then saw Smith trying to pull something out of his pocket and told Officer Sims "he's trying to pull something out of his pocket.  (B. Smith Aff. at 4; Sims Aff. at 4.)  Officer Smith did not know if Smith had a gun or some other weapon.  (B. Smith Aff. at 4.)  For his safety and the safety of others, Officer Smith maced Smith, but it had no effect on Smith and he continued to resist arrest while on the ground.[9]  (Id.; Sims Aff. at 4.)

Officer Sims called for backup from additional officers.  (Sims Aff. at 4.)  When those officer arrived, Smith was still attempting to lift Officers Smith and Sims

---

[8] Plaintiff denies using any alcohol or drugs that day. (Smith Dep. at 45, 124, 141.)

[9] Plaintiff Smith admitted to wiggling on the ground while the officers were on top of him and to "moving all my body on the ground."  (Smith Dep. at 183, 188.)

up off the ground.  (B. Smith Aff. at 4-5; Sims Aff. at 4.)  One of the other officers handcuffed Smith with the assistance of Officers Smith and Sims.  (B. Smith Aff. at 5; Sims Aff. at 4-5.)  Sergeant Marsha Johnson, a supervisor, arrived on the scene after Smith was restrained.  (B. Smith Aff. at 5; Sims Aff. at 5.)  Smith was arrested for disorderly conduct.  (Id.)

## C.  The Aftermath

After he was restrained, the City of Birmingham Fire and Rescue Engine number 12 came to the scene to review Smith.  (Id.; King Aff. ¶ 4.)  The Incident Report from Birmingham Fire and Rescue stated that it arrived around 5:15 a.m. and they examined a male who was bleeding from the head. (Def. Exh. 9 to Smith Dep.)  Officer Sims then transported Smith to Cooper Green Hospital.  (Sims Aff. at 5; Smith De. at 68, 148.)  Smith refused treatment at Cooper Green.  (Id. at 68-70, 82-83, 148.)  He testified that he refused treatment because he was terrified of the officers who took him to the hospital - the same two who had just arrested him.  (Id. at 68-69, 148-49.)  After he refused treatment at the hospital, Smith was taken to the Birmingham jail and released later that day.  (Smith Dep. at 70; see Def.'s Exh. 10 to Smith Dep.)  Smith was charged with disorderly conduct, but the case was ultimately dismissed.  (Def. Exh. 3 to Smith Dep.)

Later that same day, after Smith was released from jail, he returned to Cooper

Green Hospital to have his injuries examined.  (Smith Dep. at 72.)  The initial

comments of the doctor indicate that Smith complained of generalized body aches and

had scattered bruises.  (Pl. Exh. 1 to Smith Dep.)  The doctor examined Smith and

found scattered abrasions, and bilateral elbow and hand contusions.  (Pl. Exh. 6 to

Smith Dep.) There was also some swelling and tenderness.  (Id.) The x-rays revealed

a "mild AC separation"[10] of his left shoulder, but that all bone and joint structures

were normal and that there was "no soft tissue calcification or significant swelling."

(Id.)   He had a CT scan of his head and brain as well as his cervical spine and no

abnormalities were discovered.  (Def. Exh. 7 to Smith Dep.)  The doctor's diagnosis

was contusions and abrasions of face and extremities, and she discharged Smith with

some medicine for pain.  (Pl. Exh. 6 to Smith Dep.)

## IV.  Applicable Substantive Law and Analysis

The Complaint alleges seven claims - four against Officers Smith and Sims and

three against the City of Birmingham and Chief Roper.  The four claims against the

---

[10] "An acromioclavicular (AC) joint separation is the formal name for a separation of the collar bone from the shoulder blade. The collar bone (clavicle) and the shoulder blade (scapula) together form the socket that holds the ball of the upper arm bone. An AC joint separation is most typically caused by falling or being hit on the point of the shoulder blade or an outstretched arm. It can happen from a fall on ice, playing a contact sport such as football or falling over the handlebars of a bike." Cedars-Sinai, *Acromioclavicular (AC) Joint Separation*, http://www.cedars-sinai.edu/Patients/Programs-and-Services/Orthopaedic-Center/Clinical-Progra ms/Sports-Medicine/Acromioclavicular-AC-Joint-Separation.aspx (last visited February 4, 2014).

officers are as follows: (1) excessive force; (2) assault and battery; (3) failure to intervene; and (4) the tort of outrage.   The remaining three claims against the City and Chief Roper are as follows: (1)  negligent supervision; (2) inadequate training; and (3) deliberate indifference.   (Compl. at 4-7.)  All of the claims are brought pursuant to 42 U.S.C. § 1983, except for the two state law claims for assault and battery and the tort of outrage, which are brought pursuant to Alabama state law. (Id.)  The court first addresses the claims against the officers and then addresses the claims against the City of Birmingham and Chief Roper.

**A.  Claims against Officer Sims and Officer Smith**

Before beginning the court's discussion of the merits of each claim, the court notes that Officer Sims and Officer Smith are sued in their individual and official capacities.   When a plaintiff sues a municipal officer in the officer's individual capacity for alleged constitutional violations, the plaintiff seeks money damages directly from the individual officer.  See Kentucky v. Graham, 473 U.S. 159, 165 (1985).  In contrast to individual capacity suits, when an officer is sued under section 1983 in his official capacity, the suit is simply "'another way of pleading an action against an entity of which an officer is an agent.'"  Id. (citing Monell v. Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978)).  Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents.

14

See id. at 165-66; Brandon v. Holt, 469 U.S. 464, 471-72 (1985); Monell, 436 U.S. at 691; Farred v. Hicks, 915 F.2d 1530, 1532 (11th Cir. 1990).  Because Smith asserts claims against the City directly for the alleged actions of the officers, the claims against Officer Sims and Officer Smith in their official capacities are due to be dismissed.[11]

### 1. Excessive Force

To succeed on his § 1983 claims against the officers in their individual capacities, Smith must establish that he suffered a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States and that the act or omission causing the deprivation was committed by a person acting under the color of state law.  Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005).  That being said, however, the doctrine of qualified immunity can shield law enforcement officers from liability.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Under this doctrine, law enforcement officers are entitled to qualified immunity so long as the alleged civil damages arose from the officers' discharge of their discretionary functions and their conduct "could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 635, 638

---

[11] The same reasoning applies to the claims brought against Chief Roper in his official capacity.

(1987). Qualified immunity does not provide a mere defense to liability, but rather a complete immunity from suit. Saucier v. Katz, 533 U.S. 194, 200–01 (2001).

To claim qualified immunity, the officer first must show that he was acting within his discretionary authority when the alleged violation occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Once this is shown, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007). To avoid summary judgment on the basis of qualified immunity, the plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). In Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009), the Supreme Court recognized that the court need not conduct the qualified immunity analysis in this exact sequence; rather, the court may now exercise our sound discretion to decide which prong of the inquiry to address first. Pearson, 129 S. Ct. at 818.

Smith does not contend that Officers Sims and Smith were not acting pursuant to their discretionary authority when they arrested him. Accordingly, the pertinent inquiry is whether the facts, when viewed in the light most favorable to Smith, establish that the officers violated a constitutional right. If they did not, then the

16

inquiry is over and the officers are entitled to qualified immunity.  Saucier, 533 U.S. at 201.  On the other hand, if they did violate a constitutional right, then the court must determine if the right was "clearly established" at the time of the violation.  Id.

### a. Was there a Constitutional Violation?

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension. Graham v. Connor, 490 U.S. 386, 394–95 (1989); Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005).  In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's "objective reasonableness" standard.  Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (citations omitted).  A genuine "excessive force" claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest.  Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006).  To determine whether the use of force is "objectively reasonable," the court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case.  Graham, 490 U.S. at 396 (internal citations and quotations omitted). The court measures the quantum of force employed against these factors — (1) the severity of the crime at issue; (2) whether

17

the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. Lee, 284 F.3d at 1197–98.  Notably, the court considers the officers'  actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004), recognizing that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97.

There is a clear and unmistakable dispute of facts regarding the force used here and the need for that force.  Plaintiff's version of events surrounding the force used differs dramatically from Officer Sims and Smith's version of events, but it is Plaintiff's version that the court must accept as true for purposes of summary judgment.   Plaintiff testified that he was walking in the street, minding his own business, when one of the officers told him to walk on the sidewalk.  (Smith Dep. at 49, 126.)  Plaintiff obeyed and, without any provocation, the next thing he knew was an officer's hand was on his shoulder.   (Id. at 50, 52, 54.)  The officer then told Smith to "stop resisting arrest" and before he knew it two officers threw him down

on the ground and "sprayed him" with mace  (Id. at 54, 56.)   Smith admitted that he was trying to get away from the officers and that he was wiggling on the ground while the two officers were trying to restrain him.  (Id. at 183-84, 186-89.)   Smith denies that he attempted to put his hands in his pockets or that there was anything inside his pockets other than this keys and a wallet.  (Id. at 165-66.)  He testified that he did not have any type of weapon.  (Id. at 166.)

Regardless of what happened after the officers got him on the ground (i.e., whether he was struggling against the officers), Plaintiff's allegations of the use of force at the beginning of the encounter - being thrown down to the ground and sprayed with mace - while he was simply walking on the sidewalk, raise questions about the reason for the arrest and fact that force was used against him during his arrest.  While the court recognizes that the facts at trial may turn out differently than the facts presented on summary judgment, the court must take Plaintiff's versions of the facts are true at this stage.  On Plaintiff's facts, Officers Sims and Smith violated his constitutional right when they threw him to the ground and sprayed him with mace while he was simply walking on the sidewalk.

### b.  Was the Right Clearly Established?

Even though the actions of the officers violated the Constitution, on the facts presented at summary judgment, the court also must ask whether Plaintiff has shown

that the right violated was clearly established at the time of the violation.  Pearson, 129 S. Ct. at 814-15.  The Supreme Court has declared that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Id. The relevant inquiry to determine whether a right is clearly established is to ask whether it would be "sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Wilson v. Layne, 526 U.S. 603, 615 (1999) (internal quotation marks and citation omitted).

To determine whether a right is clearly established, the courts look to the precedent of the Supreme Court of the United States, the Eleventh Circuit's precedent, and the pertinent state's supreme court precedent (here Alabama), interpreting and applying the law in similar circumstances.  McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).  The Eleventh Circuit has "said many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'"  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).  However, in some cases, the court may find that the right is clearly established, even in the absence of case law. One such instance is where the case is one of "obvious clarity" — i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the

20

conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law" on point.  Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting Lee, 284 F.3d at 1199).   Under this test, "the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in Graham and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Lee, 284 F.3d at 1199 (internal quotation marks omitted).

Plaintiff did not present a case from the United States Supreme Court, the Eleventh Circuit, or from the Alabama Supreme Court, that clearly established that the type of force used here, under similar circumstances, constitutes excessive force. The question, therefore, becomes whether it would be clear to every reasonable officer, even in the absence of case law, that the force used was excessive under the circumstances.

Under the facts, as presented by Plaintiff, the court concludes that the force employed by Officer Sims and Officer Smith was disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that their actions were unlawful.  Plaintiff testified that he was not doing anything other than walking down a sidewalk when the officers threw him to the ground and sprayed him with mace.  Although Plaintiff did admit to struggling against the officers once

21

he was on the ground, these actions did not justify the initial force used against Plaintiff.   These initial actions were unnecessary and disproportionate that no reasonable officer could have thought this amount of force was legal under the circumstances.   When measured against these facts, as presented and accepted at the summary judgment stage, Officer Sims and Officer Smith violated a clearly established right.   Therefore, Officer Sims and Officer Smith are not entitled to qualified immunity and summary judgment is not proper on Plaintiff's claim of excessive force.

### 2.   Assault and Battery

The officers contend that they are entitled to state agent immunity under Alabama Code § 6-5-338 (1975) regarding Smith's assault and battery claims.   A state agent is not immune from civil liability "when the state agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Ex Parte Cranman, 792 So.2d 392, 405 (Ala. 2000).   Smith's version of the facts support the contention that the officers acted willfully in striking Smith and forcing him to the ground, while he was not resisting arrest.   Although the officers strongly contest Smith's version of the facts, that is not for the court to decide at summary judgment.   Instead, the officers must establish that state agent immunity would apply even if the court viewed Smith's facts as true.   This

they did not do.  (See Exh. 1 to Doc. # 9 at 28-29.)  Therefore, Officers Sims and

Smith are not entitled to state agent immunity as to Smith's assault and battery claims,

and summary judgment is due to be denied.

### 3.  Failure to Intervene

 "[A]n officer who is present at the scene and who fails to take reasonable steps

to protect the victim of another officer's use of excessive force, can be held liable for

his nonfeasance."  Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir.

2007).  However, in order to succeed on this claim, Plaintiff must show that the

"non-intervening officer was in a position to intervene yet failed to do so."  Hadley,

526 F.3d at 1331.

The facts presented here do not support a claim for failure to intervene against

either Officer Sims or Officer Smith.  Although one officer was clearly the instigator

of the incident, Smith testified that both the officers threw him to the ground, sprayed

him with mace, and were generally involved in the alleged assault and arrest.  (Id. at

143.)  He stated that "it took two of them" to restrain him because he "was being a

man."  (Id. at 143-44.)  He testified that he was trying to get away from both the

officers and that he was wiggling on the ground while the two officers were trying to

restrain him.  (Id. at 183-84, 186-89.)  Therefore, neither officer could be considered

a "non-intervening" officer as required for this claim to remain.[12]

### 4. Outrage

For the tort of outrage under Alabama law, a plaintiff must establish the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." Harrelson v. R.J., 882 So.2d 317, 322 (Ala.2 003). Considering the evidence in the light most favorable to Smith, he failed to provide evidence through testimony or medical records of "emotional distress so severe that no reasonable person could be expected to endure it." Id. In other words, Smith has failed to create a genuine issue as to whether the officers actions were "so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society ." American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980). Therefore, there is no genuine issue of material fact, and Officer Sims and Officer Smith are entitled to summary judgment as to this claim.

### 5. Summary

In summary, the following claims remain against Officers Sims and Smith in

---

[12] Smith testified that he heard other officers on the scene during the alleged assault, (Smith Dep. at 56-57), but none of these other, non-intervening officers are defendants in this case.

their individual capacities: (1) excessive force and (2) assault and battery.  Summary judgment is due to be granted to the officers in their individual capacity as to Smith's claims of failure to intervene and the tort of outrage, as well as all claims against Officer Sims and Officer Smith in their official capacity.

## B.  Claims against the City and Chief Roper

In Counts IV, V and VI, Smith alleged that Defendants the City of Birmingham and Roper "(1) failed to monitor the activities of the law enforcement officials and negligently failed to properly supervise their activities and conduct"; (2) "negligently failed to adequately train and supervise Defendant Officers in the area of excessive force and arrest procedures"; and (3) "created an atmosphere of tolerance regarding willful, wanton, and improper behaviors of officers . . . which has resulted in a pattern or practice of conduct by Birmingham Police Officers that deprive persons of rights, privileges and immunities secures [sic] of protected by the U.S. Constitution, the laws of the United States and the Alabama Constitution and the laws of Alabama." (Compl. at ¶¶ 21, 24 & 27.)  Each of these claims is brought pursuant to section 1983.

The court first notes that Plaintiff does not address his claims against Chief Roper  in his brief in opposition to summary judgment.  Instead, he concentrates solely on those claims against the City of Birmingham.  Because Plaintiff does not argue any basis upon which Chief Roper could be held liable under § 1983, the court

deems those claims abandoned and concludes that Chief Roper is entitled to summary judgment on each claim against him in the Complaint.  See Hamilton v. Southland Christian Sch ., Inc., 680 F.3d 1316, 1318–19 (11th Cir. 2012).

As for Plaintiff's claims against the City, in Monell v. New York City Dep't of Social Services, 436 U.S. 658 (1978), the United States Supreme Court decided that a municipality can be found liable under § 1983, however, in so doing, the Supreme Court placed limitations on the circumstances in which such liability would be appropriate.  To the extent that Plaintiff seeks to bring claims against the City pursuant to 42 U.S.C. § 1983, he must overcome these "strict limitations on municipal liability" which the United States Supreme Court has put in place.  Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  Under § 1983, there is no *respondeat superior* liability; a municipality may not be sued under § 1983 for the acts of others. See Monell, 436 U.S. at  691–94; see also Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999) ("A governmental entity is not liable under § 1983, merely as a matter of *respondeat superior*, for constitutional injuries inflicted by its employees.").

"Instead, a municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation."  Gold, 151 F.3d at 1350. It is incumbent upon a plaintiff seeking to hold a municipality liable pursuant to § 1983 to "identify a municipal 'policy' or 'custom' that caused [his]

injury." <u>Id.</u> A municipality may only be held liable under § 1983 "when 'the execution of the government's policy or custom . . . inflicts the injury.'" <u>Id.</u> Put another way, a plaintiff seeking to recover pursuant to § 1983 from a municipality must demonstrate that the official policy or custom[13] was the "moving force of the constitutional violation." <u>See</u>, <u>e.g.</u>, <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823 (1985). "Thus, at the very least, a plaintiff must identify a municipal policy and then demonstrate an affirmative link between the policy and the particular violation alleged." <u>Griffin v. City of Clanton, Ala.</u>, 932 F.Supp. 1359, 1370 (M. D. Ala.1996).

In applying this doctrine to this case, the Court is mindful of the Eleventh Circuit's admonition regarding the extent of municipal liability in cases such as this one. The official policy or custom requirement means that

> the City is not automatically liable under section 1983 even
> if it inadequately trained or supervised its police officers
> and those officers violated [plaintiffs'] constitutional rights.
> Instead, the Supreme Court has explained that there are

---

[13] In <u>Brown v. City of Ft. Lauderdale</u>, 923 F.2d 1474 (11th Cir. 1991), the Eleventh Circuit explained that a plaintiff can establish municipal liability under § 1983 in either one of two ways. First, liability may attach if a plaintiff demonstrates "a widespread practice that, although not authorized by written law or express municipal policy, causes a constitutional deprivation and is so permanent and well settled as to constitute a custom and usage with the force of law." <u>Id.</u> at 1481 (internal quotations and citation omitted). Second, a plaintiff can establish a municipality's liability by showing that his or her alleged constitutional injury was caused by a person who "possess[ed] 'final authority to establish municipal policy with respect to the action ordered.'" <u>Id.</u> at 1480 (quoting <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481 (1986)); <u>see</u> also <u>Jett v. Dallas Ind. Sch. Dist.</u>, 491 U.S. 701, 737 (1989); <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1337 (11th Cir. 1994).

only "limited circumstances" in which an allegation of failure to train or supervise can be the basis for liability under § 1983. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.

Gold, 151 F.3d at 1350 (internal citations omitted).

Due to its very broad and vague language, it is not possible to discern from the Complaint itself which specific policy or custom of the City allegedly caused Plaintiff's injuries. Plaintiff's brief and supporting evidence also do not identify a single policy or custom, but instead Plaintiff focuses on alleged inadequacies in training and supervision of Officers Sims and Smith.  Thus, the court must turn its focus to the adequacy of Plaintiff's claims that the City should be held liable due to alleged inadequacies in its training and supervision of its police officers.  In so doing, the court is hampered somewhat by Plaintiff's failure to identify specific areas of alleged deficiencies in the training and supervision of the officers.  The court will not "infer the existence of a culpable policy from the actions of the individual officers in this case."  Griffin, 932 F.Supp. at 1370–71.

Inadequate police training or supervision by a municipality can rise to the level of a "policy or custom" that is actionable under § 1983 where the failure to train

amounts to "deliberate indifference" to the rights of persons in the jurisdiction.  See,

e.g., City of Canton v. Harris, 489 U.S. 378, 389 (1989); Gold, 151 F.3d at 1350;

Griffin, 932 F.Supp. at 1370.

> To establish a "deliberate or conscious choice" or such
> "deliberate indifference," a plaintiff must present some
> evidence that the municipality knew of a need to train
> and/or supervise in a particular area and the municipality
> made a deliberate choice not to take any action. [The
> Eleventh Circuit Court of Appeals] repeatedly has held that
> without notice of a need to train or supervise in a particular
> area, a municipality is not liable as a matter of law for any
> failure to train or supervise.

Gold, 151 F.3d at 1350–51 (internal citations and footnote omitted). This high

standard of proof is "intentionally onerous" for plaintiffs because to require less

would be to allow a result never intended by the United States Supreme Court,

namely, subjecting a municipality to liability on the basis of *respondeat superior*. Id.

at 1351 n.10. The Eleventh Circuit has required that the municipality's knowledge of

a need for training or supervision in a particular area arise out of knowledge or

awareness of a history of widespread prior abuse or a prior incident in which

constitutional rights were similarly violated. Id. at 1351 (surveying cases).

"Deliberate indifference by a municipality cannot be demonstrated merely by

examining the actions of police officers during a single incident of unconstitutional

conduct."  Griffin, 932 F.Supp. at 1371.  Absent such evidence of prior incidents, a

29

municipality cannot have been deliberately indifferent to the need to train and supervise in a particular area unless the need was so obvious and the likelihood of constitutional violations was highly predictable.[14]  Id. at 1351–52.

Rather than pointing to some deficiency in the written policies or procedures of the City with respect to training or supervision of officers or offering evidence of prior incidents of similar constitutional violations, Plaintiff attempts to establish a basis for municipal liability by arguing that the Chief of Police ratified the conduct of its employees.  (Doc. # 11 at 12-13.)  Specifically, Plaintiff contends that "Roper was the policymaker for the police department, has the opportunity to review the investigation of the defendant police officers' conduct, and agreed that those actions were within the use of force policy of the policy department."  (Id. at 13.)  This argument is the entire basis for Plaintiff's assertion that the City should be held liable under § 1983 for what Plaintiff contends to be numerous violations of his constitutional and state rights.

Viewing all the evidence in the light most favorable to the Plaintiff, he simply cannot establish an appropriate basis for municipal liability in this case under the applicable law established by the Supreme Court and the Eleventh Circuit.  Although

---

[14] For example, cases involving the use of deadly force when firearms are provided to police officers fall into this very limited category.  Griffin, 932 F.Supp. at 1352.

30

Plaintiff attempts to argue some form of municipal liability premised under the law, his argument is really based only on *respondeat superior* liability.  It is beyond clear that such an argument is not an appropriate basis for municipal liability under § 1983 – "a municipality cannot be held liable *solely* because it employs a tortfeasor." Monell, 436 U.S. at 691 (emphasis in original).  Because Plaintiff has failed to establish the required predicate for his claims against the City, the City of Birmingham is entitled to judgment as a matter of law as to each claim alleged in the Complaint against it.

## V.  Conclusion

In conclusion, summary judgment is due to be granted in full as to the City of Birmingham and Chief of Police A.C. Roper as to all claims asserted against them by Plaintiff.  Summary judgment is due to be granted against Officer Robert Sims and Officer Bryan Smith as to all claims asserted against them in their official capacities, as well as to Plaintiff's claims of failure to intervene and the tort of outrage in their individual capacities.  Summary judgment is due to be denied as to both officers as to Plaintiff's claims of excessive force and assault and battery.  A separate order will be entered.

**DONE** this the ___18th___ day of February, 2014.

_James H. Hancock_
SENIOR UNITED STATES DISTRICT JUDGE